RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 26a0222p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

─────────────

LEANDRO EDIMAR SPINDOLA,

*Petitioner*,

*v.*

TODD W. BLANCHE, Acting U.S. Attorney General,

*Respondent*.

No. 25-3600

─────────────

On Petition for Review from the Board of Immigration Appeals.
No. A 241 439 010.

Argued: June 3, 2026

Decided and Filed: August 7, 2026

Before: BATCHELDER, GRIFFIN, and MATHIS, Circuit Judges.

─────────────

## COUNSEL

**ARGUED:** Mariya Howykowycz, Parma, Ohio, for Petitioner. Rodolfo D. Saenz, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Respondent. **ON BRIEF:** Mariya Howykowycz, Parma, Ohio, for Petitioner. Melissa K. Lott, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Respondent.

─────────────

## OPINION

─────────────

ALICE M. BATCHELDER, Circuit Judge. Petitioner Leandro Edimar Spindola is a Brazilian citizen and native who claims to have entered the United States in November 2023. The Department of Homeland Security initiated removal proceedings against him in April 2024. After conceding removability under the Immigration and Nationality Act, he applied for asylum,

withholding of removal, and relief from removal under Article III of the Convention Against Torture (CAT).  An Immigration Judge (IJ) denied his application, and the Board of Immigration Appeals (BIA) affirmed.

In his petition for review before this court, Spindola argues that the BIA improperly applied the serious-nonpolitical-crime bar to his application for asylum and withholding of removal.  *See* 8 U.S.C. §§ 1158(b)(2)(A)(iii), 1231(b)(3)(B)(iii).  Spindola contends that the alleged conduct in Brazil underlying this bar—his chasing his nephew by car for over two kilometers, shooting multiple times at the vehicle that his nephew was driving, and ultimately striking him, causing serious injury—does not warrant its application because Spindola purportedly lacked the specific intent to commit the crime for which he has been charged under Brazilian law (attempted murder) and, at any rate, he was justified in his actions under a defense-of-others theory.  Regarding CAT relief, he argues that the BIA erred in its assessment of his risk of torture and the chance of official consent or acquiescence.

We cannot agree.  The serious-nonpolitical-crime bar requires us to consider whether "there are serious reasons for believing that the alien has committed a serious nonpolitical crime outside the United States prior to the arrival of the alien in the United States."  *Id.* §§ 1158(b)(2)(A)(iii); *see also* 1231(b)(3)(B)(iii).  The BIA and several of our sister circuits equate the "serious reasons for believing" standard to the familiar burden of establishing probable cause.  We adopt that standard today and find that substantial evidence supports the BIA's conclusion that the government met its burden in this case.  Spindola's counterarguments—that he lacked the intent needed to sustain an attempted-murder charge and that he was acting in defense of others—do not legally preclude the bar's application.  The BIA factually discounted those claims with substantial evidence.  Substantial evidence also supports the BIA's conclusion that Spindola failed to prove a sufficient likelihood of his being tortured with the consent or acquiesce of public officials in Brazil.  We **DENY** his petition.

# I.

Spindola, his wife (Dirceana Santello), and their three children are natives and citizens of Brazil.  While they lived in Brazil, Dirceana and her siblings inherited real estate when their

father died; each sibling inherited a twelfth of the property. Aiming to start a cattle business, Dirceana sold her share to her sister, Marta. According to Spindola, the sisters orally agreed to a purchase price of 325,000 Brazilian reais, but their written contract recorded a price of 121,000 Brazilian reais, apparently in an effort to avoid paying taxes and to hide the true sale amount from Marta's son, Rafael. Instead of paying in cash, Marta ostensibly paid for equipment, cattle, and cattle feed for the Spindolas.

Things did not turn out well. Marta told her son that she was the true owner of assets purportedly purchased for the Spindolas pursuant to the oral agreement. In October 2017, Rafael ordered a truck to collect the cattle feed, but Spindola turned the truck away. In November, Rafael, Marta, and five other individuals again attempted to take the cattle feed, this time while Spindola was not there, and they assaulted Spindola's father in the process. Spindola arrived and called the police, who ordered everyone to report to the police station to sort out the affair. After everyone left, Rafael, Marta, and company returned and attempted to take the feed a third time. Spindola again called the police, who escorted everyone to the police station. The police told the parties to resolve their dispute in civil court.

Civil proceedings began but did not stave off further escalation. On December 6, 2017, Spindola's employee told him that Rafael and two accomplices were looking for him, reportedly seeking to cut off Spindola's hands. Spindola then called the police and asked them to send a squad car to his residence, but the police initially refused to dispatch any officers. Rafael and at least one accomplice arrived at Spindola's home, and an accomplice pointed a gun at Dirceana. The Spindolas locked themselves in their bathroom and alerted the police to their predicament. The police arrived and took a report, but allegedly nothing came of this incident.

A few months later on March 6, 2018, the intra-family dispute reached a boiling point. Rafael sent two accomplices—one of them a member of the Brazilian criminal syndicate Primeiro Comando da Capital (PCC)—to the Spindolas' home, where they restrained Spindola, beat him repeatedly, put a gun to his head, and threatened to kill him before fleeing, leaving behind bottles of combustible alcohol. Spindola claims that they also left behind a duffle bag containing papers about the cattle sale and instructions about what information to obtain from Spindola, including bank account numbers and passwords, but the IJ made no explicit finding as

to this detail.  Spindola contends that the police did not investigate the crime until Dirceana prompted their involvement by collecting video footage of the incident.  The police eventually searched Rafael's residence and truck, where they found ammunition, photographs of Spindola and his children, a map of the Spindola residence, photographs of Spindola's car, information about the Spindola children's school, tape, plastic handcuffs, and other restraints.  Rafael, Rafael's PCC-affiliated accomplice, and Marta were tried in a Brazilian court.  Marta was acquitted; the accomplice was sentenced to over 11 years' imprisonment; and Rafael was sentenced to over 14 years' imprisonment for aggravated robbery, unqualified extortion, and unlawful possession of firearms and ammunitions.  But Rafael served approximately two years in prison and served much of his sentence under an "open regime," which, as described by Spindola, resembles parole or home detention.  Spindola testified that, after Rafael was released, Dirceana successfully petitioned for a protective order keeping Rafael at least one hundred meters away from her and her family, but the IJ made no finding on this assertion.

The family feud continued after Rafael's conviction and release.  In 2021, Spindola's mechanic noticed someone approaching Spindola's truck while it was undergoing repairs, and when the mechanic investigated, he discovered a tracking device on the truck.  Spindola theorizes that Rafael was behind the incident, and police reportedly confirmed the presence of one of Rafael's employees in the vicinity of the mechanic's shop at the time.  In 2022, the civil lawsuit over the real-estate contract ended with a judgment *against* Dirceana; the judge ordered her to pay Marta 330,000 reais.  Rafael accompanied a court officer and police officers to the Spindola residence to inventory their property so that the debt could be satisfied.

The Spindolas' dispute with Marta and Rafael reached its apex on August 25, 2022, when Dirceana spotted Rafael driving his car in their neighborhood.  Spindola arrived at home to find his distraught wife with their children except their son Rodrygo.  Spindola retrieved his firearm, got in his vehicle, and "went searching" for Rafael and Rodrygo, whom Spindola presumed Rafael had kidnapped.  He found Rafael driving near the Spindola home.  Spindola stopped his car, saw that Rodrygo was *not* with Rafael, but still fired six shots at Rafael's vehicle, purportedly with the intention of disabling the engine.  Rafael made a U-turn, and Spindola re-entered his vehicle, firing yet another shot at Rafael's vehicle, this time with the purported

intention of striking a tire.  He struck the door.  Spindola then chased Rafael for approximately two kilometers, and as they were driving side-by-side, Spindola shot at Rafael's vehicle again, this time striking and injuring Rafael.  Spindola left the area, apparently no longer seeking to detain Rafael in connection with the suspected kidnapping.  Upon returning home, Spindola learned from Dirceana that Rodrygo had never been kidnapped but instead was just hiding in the family bakery.  Spindola self-reported to the police, who did not arrest him at the time.  Spindola and his family fled the country for the United States.  Spindola was later charged in Brazil with attempted murder, and that charge was still outstanding as of the date of the IJ's decision.

Spindola now seeks asylum, withholding of removal, and relief from removal under CAT.  The IJ and BIA rejected his application based on the serious-nonpolitical-crime bar to asylum and withholding of removal, as well as his inability to demonstrate the likelihood of torture with official consent or acquiescence needed for deferral of removal under CAT.  He now brings this petition for review.

## II.

"Where, as here, the BIA reviews the IJ's decision and issues a separate opinion, rather than summarily affirming the IJ's decision, we review the BIA's decision as the final agency determination." *Seldon v. Garland*, 120 F.4th 527, 531 (6th Cir. 2024) (citation modified).  "We review the BIA's factual findings under the substantial evidence standard and treat them as conclusive unless any reasonable adjudicator would be compelled to conclude to the contrary." *Id.* (citation modified); *see also* 8 U.S.C. § 1252(b)(4)(B).  We review legal conclusions de novo. *Seldon*, 120 F.4th at 531.

## A.

Spindola first challenges the application of the serious-nonpolitical-crime bar to his application for asylum and withholding of removal.  Spindola is ineligible for either form of relief "if the Attorney General determines that . . . there are serious reasons for believing that the alien has committed a serious nonpolitical crime outside the United States prior to the arrival of the alien in the United States."  *See* 8 U.S.C. § 1158(b)(2)(A)(iii) (asylum); *see also*

§ 1231(b)(3)(B)(iii) (withholding of removal).[1]  As explained below, Spindola's challenge to the BIA's decision turns on whether the government met its burden in establishing that there are "serious reasons to believe" that he "committed a serious nonpolitical crime" prior to his arrival in this country.  This necessitates our interpretation of the phrase "serious reasons to believe"—a matter of first impression in this circuit.  The government urges us to hold that this language requires no more than a finding under the familiar probable-cause standard.  *See* Brief of Respondent at 36 (citing *Matter of E-A-*, 26 I. & N. Dec. 1, 3 (BIA 2012)).  At oral argument, Spindola conceded this interpretation should apply.

Mindful of our duty to give this provision its "best reading" without deference to the BIA's interpretation, *Castillo v. Bondi*, 140 F.4th 777, 779 (6th Cir. 2025) (citing *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 400 (2024)); *Seldon*, 120 F.4th at 531 (citation omitted), we agree with the government.  Starting from the plain statutory text, the phrase "serious reasons to believe" bears remarkable resemblance to our probable-cause definition, "the substance" of which "is a reasonable ground for belief of guilt."  *Maryland v. Pringle*, 540 U.S. 366, 371 (2003) (citation modified).  And the unqualified breadth of the "serious reasons to believe" standard comfortably accommodates the metes and bounds of probable cause.  The latter is a "fluid concept," "incapable of precise definition or quantification"; though it "deals with probabilities and depends on the totality of the circumstances," it requires "belief of guilt [that] must be particularized with respect to the person" accused of the crime.  *Id.* at 370–71.  We hold that the immigration inquiry of "serious reasons to believe" requires no more than a finding of probable cause.

Nor are we alone in this holding.  The BIA agrees.  *Matter of E-A-*, 26 I. & N. Dec. at 3.  So do the First, Second, Eighth, and Ninth Circuits, *see Acosta v. Blanche*, 176 F.4th 58, 83 (1st Cir. 2026); *Khouzam v. Ashcroft*, 361 F.3d 161, 165 (2d Cir. 2004), *as amended* (Apr. 12, 2004); *Herrera-Elias v. Garland*, 96 F.4th 1040, 1044 (8th Cir. 2024); *Go v. Holder*, 640 F.3d 1047, 1052 (9th Cir. 2011), as well as the Third, Fourth, and Tenth Circuits, albeit in unpublished

---

[1]The serious-nonpolitical-crime bar to withholding of removal contains minor variations.  But the statutory provisions appear to be synonymous, and we have treated them as such in our past cases.  *See Berhane v. Holder*, 606 F.3d 819, 821–22 (6th Cir. 2010).

decisions, *Marroquin-Retana v. Att'y Gen. U.S.*, 675 F. App'x 216, 219 (3d Cir. 2017); *Whyte v. Garland*, No. 22-1032, 2023 WL 3092977, at *3 (4th Cir. Apr. 26, 2023); *Turcios-Ortiz v. Blanche*, No. 25-9536, 2026 WL 1397090, at *5 & n.7 (10th Cir. May 19, 2026) (accepting the BIA's interpretation without deciding). And while some of these decisions may have been influenced by a level of interpretative deference now impermissible under *Loper Bright*, others were rendered after the Supreme Court's *Loper Bright* ruling. *See, e.g.*, *Acosta*, 176 F.4th at 83; *Santana v. Blanche*, No. 25-643, 2026 WL 1068089, at *1 (9th Cir. Apr. 20, 2026) (reaffirming the Ninth Circuit's earlier published adoption of the standard). And the application of the probable-cause standard to the "serious reasons" text has origins from before *Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837 (1984), *overruled by Loper Bright*, 603 U.S. at 412. *See Khouzam*, 361 F.3d at 165 (dating the Second Circuit's interpretation to its decision in *Sindona v. Grant*, 619 F.2d 167 (2d Cir. 1980)).

In sum, consistent with our reading of the text and its longstanding interpretation in other courts, the serious-nonpolitical-crime bar to asylum and withholding of removal requires no more than a finding of probable cause. Once the government has met its burden, the petitioner bears the burden of proving that the bar does not apply. *See Mukeshimana v. Holder*, 507 F. App'x 524, 527 (6th Cir. 2012) (per curiam) (citing 8 C.F.R. §§ 1208.16(d)(2)(i), 1240.8(d)); *see also Diaz-Zanatta v. Holder*, 558 F.3d 450, 458 (6th Cir. 2009) (describing the burden-shifting framework in the context of the persecution bar to asylum and withholding of removal).

Applying this standard to Spindola's case, we hold that the IJ's and BIA's probable-cause finding is supported by substantial evidence. The IJ found that Spindola is charged with attempted murder in Brazil for his shooting of Rafael. And after reciting the facts underlying that charge—Spindola's having armed himself, shot at Rafael's vehicle *after* realizing that Rafael did not have Spindola's son Rodrygo, shot at the vehicle again while Rafael attempted to flee, chased Rafael by car for two kilometers, and finally shot at and seriously injured Rafael while Rafael was driving—the IJ concluded that he "d[id] not find the charge of attempted [murder] to be abnormal." Characterizing Spindola's actions as having "t[aken] the law into his own hands" when he "chased and shot another human being without a sufficient legal justification to do so," the IJ found that there was "no political aspect" of the shooting, rejected

Spindola's defense-of-others argument, and held that "there are serious reasons to believe [Spindola] committed the serious nonpolitical offense of attempted murder prior to his arrival in the United States."

The BIA affirmed. After acknowledging Spindola's contention that he lacked the intent to commit attempted murder and thus was guilty of only reckless endangerment, the BIA held that he "ha[d] not shown that either [the BIA], or the [IJ], are required to analyze his actions to the degree of determining whether he had the intent to kill as compared to just strike the vehicle in determining whether the serious nonpolitical crime bar applies here." More, the BIA concluded that it did not need to address Spindola's argument that he lacked the requisite intent to murder Rafael because his admitted crime—reckless endangerment—also supported a finding that he committed a serious nonpolitical crime.

We agree, and while we do not fault the BIA for alternatively analyzing the bar's application based on the admitted crime of reckless endangerment, we affirm based on the BIA's initial reasoning about the attempted-murder charge. As the BIA and IJ found, Spindola is charged with attempted murder in Brazil, and he readily admits to the conduct (sans intent) underlying that charge. This satisfies the government's probable-cause burden because intent can be reasonably inferred from the facts. Just as there is no "judicially enforceable duty to provide a grand jury with exculpatory evidence," *United States v. Angel*, 355 F.3d 462, 475 (6th Cir. 2004) (citing *United States v. Williams*, 504 U.S. 36, 47 (1992)), we see no reason why the IJ or BIA should consider Spindola's after-the-fact claims concerning his subjective intent at the government's probable-cause stage of the burden-shifting framework. Rather, this claim would be relevant to Spindola's burden to disprove the serious-nonpolitical-crime bar's application by a preponderance of the evidence.

At that latter stage, Spindola's counterargument that he lacked the requisite intent to kill Rafael, as opposed to the intent to fire several times at Rafael's vehicle while chasing him in a car, was properly rejected based on substantial evidence. As the BIA explained in its rejection of this argument, neither it nor the IJ was required to hyper-scrutinize Spindola's admitted actions, credit his testimony about his intent, and definitively determine whether he actually intended to murder his nephew. In a criminal case, a defendant's after-the-fact statement that he lacked the

intent to kill is not necessarily dispositive of the intent element, even in the context of a murder conviction. While the IJ made a "threshold determination" that Spindola's testimony was generally credible, the IJ also found that Spindola's testimony was "not persuasive or sufficient to sustain [his] burden of proof." And the IJ manifestly did not extend this credibility determination to Spindola's particular testimony about his intent: just after acknowledging Spindola's intent contention, the IJ concluded that "[g]iven these facts the court does not find the charge of attempted [murder] to be abnormal." And even after reciting Spindola's stated "intention of damaging [Rafael's] engine" with his initial shots, the IJ found that he "very well may have still been charged with attempted murder" for this conduct alone. And the BIA rejected Spindola's request to reanalyze his intent.

Substantial evidence, including the attempted murder charge in Brazil, Spindola's narrative of having chased Rafael by car while shooting at him several times, and the overarching vitriolic dispute between the Spindolas and Rafael, supports the probable-cause determination. While Spindola denied having a specific intent to kill, the "totality of the circumstances" illuminated by the record create a "fair probability" of his having committed the charged crime of attempted murder. *See Florida v. Harris*, 568 U.S. 237, 244 (2013) (defining probable cause).

We find that substantial evidence supports the BIA's rejection of Spindola's other counterargument that he acted in self-defense or in defense of others—terms he uses interchangeably to describe his purported protection of Rodrygo. *See Self-Defense*, Black's Law Dictionary (12th ed. 2024) (defining self-defense as "the use of force to protect oneself, one's family, or one's property from a real or threatened attack"). Again, Spindola bears the burden to prove by a preponderance of the evidence that his defense-of-others argument defeats the application of the serious-nonpolitical-crime bar. Spindola suggests that we adopt a re-shifting framework from the criminal-trial context: that his presenting evidence of a possible justification shifts the burden of proof back to the government. But this is not a criminal trial. The burden-shifting framework from 8 C.F.R. §§ 1208.16(d)(2)(i) and 1240.8(d) does not contemplate re-shifting the burden back to the government, and at any rate, there is no analogy between the burden of proof in a criminal trial and the burden of proof to establish "serious reasons to

believe" in an immigration hearing. The government has already met its probable-cause burden, and Spindola's defense-of-others argument is properly considered at the refutation stage, where he bears the burden of proof.

As the IJ discussed and the BIA affirmed, Spindola's conduct contradicts his argument. "Generally, a person is justified in using a reasonable amount of force in self-defense if he or she reasonably believes that the danger of bodily harm is imminent and that force is necessary to avoid this danger." *Self-Defense*, Black's Law Dictionary (12th ed. 2024). Far from preventing his victim from kidnapping his son, Spindola "took the law into his own hands" on the *assumption* that Rafael had directed *someone else* to kidnap Rodrygo. Spindola admitted that he knew that Rodrygo was not with Rafael when he shot at Rafael's vehicle. Spindola's use of deadly force to detain Rafael—in effect, a citizen's arrest for his suspected role in a kidnapping conspiracy—was not reasonably necessary. At the very least, this conclusion is supported by substantial evidence.

In a final effort to stave off the serious-nonpolitical-crime bar, Spindola asks us to remand to the BIA because, as he sees it, the BIA did not actually address his defense-of-others argument. Spindola says that the BIA ignored his "perfect" self-defense (*i.e.*, defense of others) argument and instead "made its own conclusory finding that Spindola did not 'establish by a preponderance of the evidence that imperfect self-defense is a valid defense under the facts of his case.'" But Spindola did not argue "perfect" self-defense before the BIA; he raised a general self-defense argument based on his mistaken attempt to protect Rodrygo. The BIA, recognizing that Spindola's two-kilometer pursuit of Rafael based on an erroneous kidnapping theory was far outside the realm of a meritorious perfect-self-defense argument, charitably interpreted his theory as imperfect self-defense: "[a] good-faith but ultimately mistaken belief, acted on by a criminal defendant, that self-defense is necessary to repel an attack." *Imperfect Self-Defense*, Black's Law Dictionary (12th ed. 2024). And the BIA correctly concluded that Spindola "d[id] not establish by a preponderance of the evidence that imperfect self-defense is a valid defense under the facts of his case."

**B.**

Despite the applicability of the serious-nonpolitical-crime bar to asylum and withholding of removal, Spindola could still be eligible for deferral of removal under CAT. 8 C.F.R. §§ 1208.16(c)(4), 1208.17(a). To qualify for relief under CAT, Spindola "must show that []he would more likely than not be subjected to torture if removed to [Brazil]." *See Vasquez-Rivera v. Garland*, 96 F.4th 903, 911 (6th Cir. 2024) (citation omitted); *see also* 8 C.F.R. § 1208.16(c)(2). "Torture, in this context, means 'any act by which severe pain or suffering, whether physical or mental, is intentionally inflicted, when such pain or suffering is inflicted by or at the instigation of or with the consent or acquiescence of a public official or other person acting in an official capacity.'" *Vasquez-Rivera*, 96 F.4th at 911 (citation omitted). The "[a]cquiescence of a public official requires that the public official, prior to the activity constituting torture, have awareness of such activity and thereafter breach his or her legal responsibility to intervene to prevent such activity." 8 C.F.R. § 1208.18(a)(7).

The BIA affirmed the IJ's determination that Spindola is ineligible for any relief under CAT. Before this court, Spindola asserts that the BIA incorrectly and without adequate explanation found that he did not meet his burden to prove that public officials would consent or acquiesce to his torture upon his return to Brazil. Alternatively, Spindola contends that if he returns to Brazil, he will likely be imprisoned for his shooting Rafael, creating a likelihood that he will be tortured by the PCC in prison at Rafael's direction.

Substantial evidence supports the BIA's conclusions to the contrary. First, Spindola's argument that the BIA inadequately explained its consent-or-acquiescence determination is incorrect. While "we review the BIA's decision as the final agency determination," "[t]o the extent the Board adopted the IJ's reasoning, we necessarily review the IJ's decision as well." *Vasquez-Rivera*, 96 F.4th at 907. And we permit the BIA to summarily affirm an IJ's decision without further commentary. *See Denko v. I.N.S.*, 351 F.3d 717, 726 (6th Cir. 2003). The BIA found that "police responded to [the] harm to [Spindola] and that [Rafael] was prosecuted and imprisoned," citing to the IJ's lengthy discussion of the matter. Further, the BIA determined that "public officials did not consent or acquiesce to prior harm to [Spindola] such that he suffered past torture," again citing to the IJ's thorough discourse. As explained below, the BIA's

decision, along with the portions of the IJ's reasoning adopted by the BIA, adequately address Spindola's argument.

On the merits regarding official consent or acquiescence, Spindola argues that (1) Rafael served only two years in prison before being placed on some form of house arrest and (2) public officials failed to intervene at other points in the family feud. Neither of these arguments passes muster. Even unsuccessful efforts to prevent violence can support the denial of CAT protections. *See Turcios-Flores v. Garland*, 67 F.4th 347, 359 (6th Cir. 2023). Here, where police did intervene and Spindola's attackers were punished, Spindola cannot assert acquiescence merely because the Brazilian legal system released Rafael from prison before his sentence was completed. Further, Spindola presents no evidence to suggest that Rafael's early release and home confinement was improper under Brazilian law. Second, while law enforcement may not have responded immediately to each of Spindola's calls for help during the family feud, the IJ correctly noted that none of these other instances amounted to torture. In sum, the evidence shows "that the government did not turn a willfully blind eye to" Spindola. *Patel v. Bondi*, 131 F.4th 377, 382 (6th Cir. 2025) (quotation omitted). And while we certainly lament any suffering on the part of Spindola's children at any point during this whole affair, this at most goes to the likelihood of torture, not the likelihood of official consent or acquiescence.

Finally, Spindola argues that the BIA "overlooked" his argument that if he is incarcerated upon returning to Brazil, he would likely be tortured in Brazilian prison by the PCC at Rafael's direction. The BIA did not overlook this argument. It rejected it. And for good reason. The BIA affirmed the IJ's finding that Rafael's connections to the PCC were "limited" and "speculative," citing to the IJ's findings. The IJ found that the only evidence of such a connection was a vague, unconvincing voicemail from Spindola's brother-in-law alleging that "they" (presumably Rafael and his immediate family) are associated with the PCC and criminals, as well as the fact that Rafael's accomplice in the March 6, 2018, attack was allegedly affiliated with the PCC. That individual—the only known connection between Rafael and Marta and the PCC—testified at the Brazilian criminal trial that he only met Rafael for the purpose of the extortion attempt, insisted that the extortion plot was Rafael's idea, and claimed that he did not plan on violence occurring. Rafael's trial testimony confirmed that their relationship was limited

to the extortion plot, but he cast the blame for the plan and violence on the PCC affiliate. So, the IJ found insufficient evidence that Rafael maintains a good relationship with the PCC.

Spindola essentially admits this, but he faults the BIA and IJ for not explicitly stating "whether those 'limited' connections would prevent Rafael from hiring a PCC member (or other criminals) to kill Spindola in prison." Such a conclusion is self-explanatory; we do not require the BIA or immigration courts to draw in painstaking detail every logical connection between its findings. *See Garland v. Ming Dai*, 593 U.S. 357, 369 (2021) (holding that "a reviewing court must 'uphold' even 'a decision of less than ideal clarity if the agency's path may reasonably be discerned'"). The denial of CAT relief is supported by substantial evidence.

## III.

For the foregoing reasons, we **DENY** Spindola's petition.